## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH STACHOVIC, individually and on behalf of all others similarly situated, | Case No. 1:24-06589 |
| Plaintiff, | |
| v. | Judge Lewis A. Kaplan |
| PIG NEWTON, INC., | |
| Defendants. | |

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES
## TO PLAINTIFF'S CLASS ACTION COMPLAINT

Defendant Pig Newton, Inc. ("Pig Newton"), by and through undersigned counsel, hereby answers and asserts its affirmative defenses to Plaintiff, Elizabeth Stachovic's ("Plaintiff"), Class Action Complaint (the "Complaint") as follows:

### NATURE OF THE CASE

1.     Plaintiff brings this action to redress Defendant **PIG NEWTON INC.'S** ("Defendant") practices of knowingly disclosing Plaintiff's and its other customers' identities and the titles of the prerecorded video materials that they purchased to Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. ("Facebook"), in violation of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

**ANSWER:**  Pig Newton admits only that paragraph 1 purports to summarize the allegations of Plaintiff's Complaint. Pig Newton denies that Plaintiff or any putative class is entitled to any of the relief requested pursuant to any cause of action and denies the remaining allegations in paragraph 1.

2.     Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its customers' personally identifying video viewing information to Meta using

a snippet of programming code called the "Meta Pixel," which Defendant chose to install and configure on its louisck.com.

**ANSWER:**  Pig Newton denies the allegations in paragraph 2.

3.    The information Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the title of the specific prerecorded video material that each of its customers purchased on its website. An FID is a unique sequence of numbers linked to a specific Meta profile. A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person). Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Meta information that reveals the specific videos that a particular person purchased on Defendant's website (hereinafter, "Private Viewing Information").

**ANSWER:**  Pig Newton denies the allegations in paragraph 3.

4.    Defendant disclosed and continues to disclose its customers' Private Viewing Information to Meta without asking for, let alone obtaining, their consent to these practices.

**ANSWER:**  Pig Newton denies the allegations in paragraph 4.

5.    The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information

2

concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

**ANSWER:**  Pig Newton denies the first sentence in paragraph 5. The remaining allegations in paragraph 5 purport to quote portions the VPPA, which speaks for itself. Pig Newton denies the allegations in paragraph 5 to the extent they are inconsistent with, mischaracterize, or misquote the VPPA.

6.      Accordingly, on behalf of herself and the putative Class members defined below, Plaintiff brings this Class Action Complaint against Defendant for intentionally and unlawfully disclosing their Personal Viewing Information to Meta.

**ANSWER:**  Pig Newton admits only that paragraph 6 purports to summarize the allegations of Plaintiff's Complaint. Pig Newton denies that Plaintiff or any putative class is entitled to any relief pursuant to any cause of action.

**PARTIES**

**I.    Plaintiff Stachovic**

7.      Plaintiff Elizabeth Stachovic is, and at all times relevant hereto was, a citizen and resident of Cook County in Chicago, Illinois.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 and therefore denies the same.

8.      Plaintiff has used and continues to use the same device to maintain and access an active Facebook account throughout the relevant period in this case.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 and therefore denies the same.

9.      On or about November 13, 2023, Plaintiff purchased prerecorded video material from Defendant by requesting and paying for such material on Defendant's website, louisck.com, and by providing her name, email address, and home address for shipment of such material. Accordingly, Plaintiff requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its website.

**ANSWER:**  Pig Newton admits that Plaintiff purchased prerecorded video material from Pig Newton's website and provided her name, email address, and home address in the course of making that purchase. Pig Newton denies that Plaintiff made any purchase on November 13, 2023. The remaining allegations in paragraph 9 are legal conclusions to which no response is required. To the extent a response is required, Pig Newton denies the remaining allegations in paragraph 9.

10.      At all times relevant hereto, including when purchasing prerecorded video material from Defendant on its website, Plaintiff had a Meta account, a Meta profile, and an FID associated with such profile.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 and therefore denies the same.

11.      When Plaintiff purchased prerecorded video material from Defendant on its website, Defendant disclosed to Meta Plaintiff's FID coupled with the specific title of the video she purchased (as well as the URL where such video is available for purchase), among other information about Plaintiff and the device she used to make the purchase.

**ANSWER:**  Pig Newton denies the allegations in paragraph 11.

12.      Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Meta. In fact, Defendant has never even provided

#35462390v1

Plaintiff with written notice of its practices of disclosing its customers' Personal Viewing Information to third parties such as Meta.

**ANSWER:**  Pig Newton denies that it disclosed any consumer's PII, as that term is defined by the VPPA, to any third party. Pig Newton denies the remaining allegations in paragraph 12.

13.    Because Defendant disclosed Plaintiff's Private Viewing Information (including her FID, the title of the prerecorded video material she purchased from Defendant's website, and the URL where such video is available for purchase) to Meta during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

**ANSWER:**  Pig Newton denies that it disclosed any consumer's PII, as that term is defined by the VPPA, to any third party. The remaining allegations in paragraph 13 contain legal conclusions to which no response is required. To the extent a response is required, Pig Newton denies the remaining allegations in paragraph 13.

**II.    Defendant Pig Newton, Inc.**

14.    Defendant is a New York corporation that maintains its headquarters and principal place of business at 50 Rockefeller Plaza, Fourth Floor, New York, NY 10020. Defendant operates and maintains the website louisck.com, where it sells various types of pre-recorded videos.

**ANSWER:**  Pig Newton admits the allegations in paragraph 14.

## JURISDICTION AND VENUE

15.    The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

**ANSWER:**  Paragraph 15 contains a legal conclusion to which no response is required. To the extent a response is required, Pig Newton does not contest this Court's jurisdiction.

#35462390v1

16.     Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in New York, New York, within this judicial District.

**ANSWER:**  Paragraph 16 contains a legal conclusion to which no response is required. To the extent a response is required, Pig Newton does not contest this Court's jurisdiction or venue.

### VIDEO PRIVACY PROTECTION ACT

17.     The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta) information that personally identifies consumers (like Plaintiff) as having viewed particular videos or other audio-visual materials.

**ANSWER:**   The allegations in paragraph 17 are legal conclusions to which no response is required. To the extent a response is required, the VPPA speaks for itself and Pig Newton denies the allegations in paragraph 17 to the extent they are inconsistent with or mischaracterize the VPPA.

18.     Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4). It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

6

**ANSWER:**  The allegations in paragraph 18 purport to quote portions of the VPPA. The VPPA speaks for itself and Pig Newton denies the allegations in paragraph 18 to the extent they are inconsistent with, mischaracterize, or misquote the VPPA.

19.    Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id*. Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

**ANSWER:**  The allegations in paragraph 19 purport to quote statements made by United States Senators, which speak for themselves. Pig Newton denies the allegations in paragraph 19 to the extent they are inconsistent with, mischaracterize, or misquote the referenced statements.

20.    Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988). As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great

deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

**ANSWER:**  The allegations in paragraph 20 purport to quote statements made by United States Senator Patrick J. Leahy, which speak for themselves. Pig Newton denies the allegations in paragraph 20 to the extent they are inconsistent with, mischaracterize, or misquote the referenced statements.

21.    While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

**ANSWER:**  The allegations in paragraph 20 purport to quote and characterize statements made by Senator Patrick J. Leahy, which speak for themselves. Pig Newton denies the allegations in paragraph 21 to the extent they are inconsistent with, mischaracterize, or misquote the referenced statements.

22.    Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the

---

[1] The Complaint includes a number of footnotes. To the extent any such footnotes can be deemed to constitute allegations, Pig Newton denies them.

8

right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."

**ANSWER:**  The allegations in paragraph 22 purport to quote statements made by United States Senator Al Franken, which speak for themselves. Pig Newton denies the allegations in paragraph 22 to the extent they are inconsistent with, mischaracterize, or misquote the referenced statements.

23.    In this case, however, Defendant deprived Plaintiff and numerous others similarly situated persons of that right by systematically (and surreptitiously) disclosing their Personal Viewing Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

**ANSWER:**  Pig Newton denies the allegations in paragraph 23.

## BACKGROUND FACTS

### I.    Consumers' Personal Information Has Real Market Value

24.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."

**ANSWER:**  The allegations in paragraph 24 purport to quote statements made by Federal Trade Commission ("FTC") Commissioner Orson Swindle, which speak for themselves. Pig Newton denies the allegations in paragraph 24 to the extent they are inconsistent with, mischaracterize, or misquote the referenced statements.

25.    Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.

#35462390v1

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 and therefore denies the same.

26.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.

**ANSWER:** The allegations in paragraph 26 purport to quote statements made by the FTC, which speak for themselves. Pig Newton denies the allegations in paragraph 26 to the extent they are inconsistent with, mischaracterize, or misquote the referenced FTC statements.

27.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 and therefore denies the same.

28.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies the same.

#35462390v1

29.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolve to take advantage of the increasingly specific pieces of information about consumers that are now available."

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 and therefore denies the same.

30.    Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.

**ANSWER:** The allegations in paragraph 30 purport to characterize and quote statements made by the Congressional Bi-Partisan Privacy Caucus, which speak for themselves. Pig Newton denies the allegations in paragraph 30 to the extent they are inconsistent with, mischaracterize, or misquote the referenced statements.

31.    Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Defendant share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.

11

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies the same.

32.    Disclosures like Defendant's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."

**ANSWER:** Pig Newton denies that it disclosed any consumer's PII, as that term is defined by the VPPA, to any third party. Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 and therefore denies the same.

33.    The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."

**ANSWER:** The allegations in paragraph 33 purport to quote statements made by the FTC, which speak for themselves. Pig Newton denies the allegations in paragraph 33 to the extent they are inconsistent with, mischaracterize, or misquote the referenced FTC statements.

34.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore denies the same.

35.    Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other

12

third parties has become a widespread practice. Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

**ANSWER:**  Pig Newton denies that it violated any consumer's statutory rights or jeopardized any consumer's well-being. Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore denies the same.

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

36.    As the data aggregation industry has grown, so has consumer concerns regarding personal information.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 and therefore denies the same.

37.    A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online. As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 and therefore denies the same.

38.    Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors. In fact, consumer's personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 and therefore denies the same.

39.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to policies of protecting their personal data.

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 and therefore denies the same.

40.     Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights. As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

**ANSWER:** Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 and therefore denies the same.

### III.    Defendant Uses the Meta Pixel to Systematically Disclose its Customers' Personal Viewing Information to Meta

41.     As alleged below, whenever a person with a Meta account purchases prerecorded video material from Defendant on its website, the Meta Pixel technology that Defendant intentionally installed on its website transmits the customer's personally identifying information and detailed Private Viewing Information (revealing the specific titles of the prerecorded video material that he or she purchased) to Meta – all without the customer's consent, and in clear violation of the VPPA.

**ANSWER:** Pig Newton denies the allegations in paragraph 41.

#35462390v1

### A. The Meta Pixel

42.     On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta". Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 and therefore denies the same.

43.     The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 and therefore denies the same.

44.     Additionally, a Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts." This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor. Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 and therefore denies the same.

#35462390v1

45.     Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed. Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

**ANSWER:**  Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 and therefore denies the same.

46.     Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take," including, as relevant here, the specific prerecorded video material that they purchase on the website.

**ANSWER:**  Pig Newton denies that it disclosed any consumer's PII, as that term is defined by the VPPA, to any third party. Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 46 and therefore denies the same.

**B.    Defendant Knowingly Uses the Meta Pixel to Transmit the Private Viewing Information of its Customers to Meta**

47.     Defendant sells prerecorded video materials to consumers on its website, louisck.com. These video materials include "Shows & Specials" and "Films."

**ANSWER:**  Pig Newton admits the allegations in paragraph 47.

48.     To make a purchase of prerecorded video material from Defendant's website, a person must provide at least or her name, email address, billing address, and credit or debit card (or other form of payment) information.

**ANSWER:**  Pig Newton admits the allegations in paragraph 48.

16

49.    Whenever a person with a Meta account purchases prerecorded video material from Defendant on its website, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).

**ANSWER:** Pig Newton denies the allegations in paragraph 49.

50.    In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendant intentionally programmed its website (by following step-by-step instructions from Meta's website) to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material on its website, along with the specific title of the prerecorded video material that the person purchased.

**ANSWER:** Pig Newton denies the allegations in paragraph 50.

51.    With only a person's FID and the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendant on its website—all of which Defendant knowingly provides to Meta on a systematic basis—any ordinary person could learn the identity of the person to whom the FID corresponds and the title of the specific prerecorded video material that the person purchased (and thus requested and obtained). This can be accomplished simply by accessing the URL www.facebook.com/[*insert the person's FID here*]/.

**ANSWER:** Pig Newton denies the allegations in paragraph 51.

52.    Defendant's practices of disclosing the Private Viewing Information of its customers to Meta continued unabated for the duration of the two-year period preceding the filing

of this action. At all times relevant hereto, whenever the Plaintiff or any other person purchased prerecorded video material from Defendant on its website, Defendant disclosed to Meta (*inter alia*) the specific title of the video material that was purchased (including the URL where such material is available for purchase), along with the FID of the person who purchased it (which, as discussed above, uniquely identified the person).

**ANSWER:** Pig Newton denies the allegations in paragraph 52.

53.    At all times relevant hereto, Defendant knew that the Meta Pixel was disclosing its customers' Private Viewing Information to Meta.

**ANSWER:** Pig Newton denies the allegations in paragraph 53.

54.    Although Defendant could easily have programmed its website so that none of its customers' Private Viewing Information is disclosed to Meta, Defendant instead chose to program its website so that all of its customers' Private Viewing Information is disclosed to Meta.

**ANSWER:** Pig Newton denies that it disclosed any consumer's PII, as that term is defined by the VPPA, to any third party. Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 54 and therefore denies the same.

55.    Before transmitting its customers' Private Viewing Information to Meta, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

**ANSWER:** Pig Newton denies that it disclosed any consumer's PII, as that term is defined by the VPPA, to any third party. Pig Newton denies the remaining allegations in paragraph 55.

56.    By intentionally disclosing to Meta each Plaintiff's and its other customers FIDs together with the specific video material that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

**ANSWER:** Pig Newton denies the allegations in paragraph 56.

**CLASS ACTION ALLEGATIONS**

57.     Plaintiff seeks to represent a class defined as all persons in the United States who, during the two years preceding the filing of this action, purchased prerecorded video material from Defendant's louisck.com website while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

**ANSWER:** Pig Newton denies that this matter may be properly maintained as a class action under the Federal Rules of Civil Procedure. Pig Newton lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57 and therefore denies the same.

58.     Class members are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in at least the tens of thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

**ANSWER:** Pig Newton denies the allegations in paragraph 58.

59.     Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to (a) whether Defendant embedded Meta Pixel on its website that monitors and tracks actions taken by visitors to its website; (b) whether Defendant reports the actions and information of visitors to Meta; (c) whether Defendant knowingly disclosed Plaintiff's and Class members' Private Viewing Information to Meta; (d) whether Defendant's conduct

violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether the Plaintiff and Class members are entitled to a statutory damage award of $2,500, as provided by the VPPA.

**ANSWER:** Pig Newton denies the allegations in paragraph 59.

60.     The named Plaintiff's claims are typical of the claims of the Class in that the Defendants' conduct toward the putative class is the same. That is, Defendant embedded Meta Pixel on its website to monitor and track actions taken by class members to its website and report this to Meta. Further, the named Plaintiff and the Class members suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to Meta.

**ANSWER:** Pig Newton denies the allegations in paragraph 60.

61.     Plaintiff is an adequate representative of the Class because she is interested in the litigation; her interests do not conflict with those of the Class members she seeks to represent; she has retained competent counsel experienced in prosecuting class actions and intends to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of all Class members.

**ANSWER:** Pig Newton denies the allegations in paragraph 61.

62.     The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's

complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**ANSWER:**  Pig Newton denies the allegations in paragraph 62.

### CAUSE OF ACTION
### Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

63.     Plaintiff repeats the allegations asserted in the preceding paragraphs as if fully set forth herein.

**ANSWER:**  Pig Newton reasserts its answers above as if fully set forth herein.

64.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

**ANSWER:**  The allegations in paragraph 64 are legal conclusions to response is required. To the extent a response is required, Pig Newton states that the VPPA speaks for itself. Pig Newton denies the any allegation in paragraph 64 that is inconsistent with, mischaracterizes, or misquotes the VPPA. Pig Newton denies the remaining allegations in paragraph 64.

65.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the

#35462390v1

business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

**ANSWER:**  Pig Newton admits that it is engaged in the business of selling prerecorded video materials. The remaining allegations in paragraph 65 are legal conclusions to response is required. To the extent a response is required, Pig Newton states that the VPPA speaks for itself. Pig Newton denies the any allegation in paragraph 65 that is inconsistent with, mischaracterizes, or misquotes the VPPA.

66.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and Class members are each a "consumer" within the meaning of the VPPA because they each purchased prerecorded video material from Defendant's website that was sold and delivered to them by Defendant.

**ANSWER:**  Pig Newton admits that Plaintiff purchased prerecorded video material from Pig Newton's website. The remaining allegations in paragraph 66 are legal conclusions to response is required. To the extent a response is required, Pig Newton states that the VPPA speaks for itself. Pig Newton denies the any allegation in paragraph 66 that is inconsistent with, mischaracterizes, or misquotes the VPPA.

67.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained the specific video materials or services from a video tape service provider." The Private Viewing Information that Defendant transmitted to Meta constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and Class members to Meta as an individual

who purchased, and thus "requested or obtained," specific prerecorded video material from Defendant via its website.

**ANSWER:**  The allegations in paragraph 67 are legal conclusions to response is required. To the extent a response is required, Pig Newton states that the VPPA speaks for itself. Pig Newton denies the any allegation in paragraph 67 that is inconsistent with, mischaracterizes, or misquotes the VPPA. Pig Newton denies the remaining allegations in paragraph 67.

68.    Defendant knowingly disclosed Plaintiff's and Class members' Private Viewing Information to Meta via the Meta Pixel technology because Defendant intentionally installed and programmed the Meta Pixel code on its website, knowing that such code would transmit to Meta the titles of the video materials purchased by its customers coupled with its customers' unique identifiers (including FIDs).

**ANSWER:**  Pig Newton denies the allegations in paragraph 68.

69.    Defendant failed to obtain informed written consent from Plaintiff or Class members authorizing it to disclose their Private Viewing Information to Meta or any other third party. More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material on its website (including the Plaintiff or Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. See 18 U.S.C. § 2710(b)(2).

#35462390v1

**ANSWER:** Pig Newton denies that it disclosed any consumer's PII, as that term is defined by the VPPA, to any third party. The remaining allegations in paragraph 69 constitute legal conclusions to which no response is required. To the extent a response is required, Pig Newton denies the remaining allegations in paragraph 69.

70.    By disclosing Plaintiff's and Class members' Private Viewing Information, Defendant violated their statutorily protected right to privacy in their Private Viewing Information.

**ANSWER:** Pig Newton denies the allegations in paragraph 70.

71.    Consequently, Defendant is liable to the Plaintiff and Class members for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

**ANSWER:** Pig Newton denies the allegations in paragraph 71.

## AFFIRMATIVE DEFENSES

1.    Plaintiff's and the putative class's claims are barred, in whole or in part, by their lack of standing.

2.    Plaintiff and the putative class have failed to state a claim upon which relief may be granted.

3.    Plaintiff's and the putative class's claims are barred, in whole or in part, by the applicable statute of limitations.

4.    Plaintiff's and the putative class's claims are barred, in whole or in part, by the equitable doctrines of estoppel, waiver, consent, release and laches.

5.    Plaintiff and the putative class have failed to take reasonable steps to mitigate their damages, if any.

6.    Plaintiff's and the putative class's alleged damages are the result of acts or omissions committed by Plaintiff and/or the putative class.

7.      Plaintiff's and the putative class's alleged damages are the result of acts or omissions committed by non-parties to this action over whom Pig Newton has no responsibility or control.

8.      Plaintiff's and the putative class's claims, and any claim for exemplary or punitive damages asserted by Plaintiff and/or the putative class, violate Pig Newton's rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

9.      Pig Newton reserves the right to assert additional defenses as may become apparent through additional investigation and discovery.

WHEREFORE, Defendant Pig Newton, Inc. denies that Plaintiff is entitled to judgment or to any of the relief sought, and respectfully requests that judgment be entered in its favor and against Plaintiff on all counts set forth in the Class Action Complaint and that Pig Newton be awarded its costs incurred in defending this action, along with such other relief as this Court deems equitable and just.

Dated:  January 24, 2025               Respectfully submitted,

/s/     Jennifer W. Torrez
**MCDONALD HOPKINS LLC**

R. David Lane
39533 Woodward Avenue, Suite 318
Bloomfield Hills, MI 48304
Telephone: 248-402-4072
dlane@mcdonaldhopkins.com

Jennifer Torrez (*pro hac vice*)
300 North LaSalle Street, Suite 1400
Chicago, IL 60654
Telephone: 216-348-5400
jtorrez@mcdonaldhopkins.com

*Counsel for Defendant Pig Newton, Inc.*

#35462390v1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the above and foregoing was served upon the following by email, on January 24, 2025:

Frank S. Hedin
HEDIN LLP
1395 Brickell Ave. Suite 610
Miami, FL 33131-3302
fhedin@hedinllp.com

Tyler K. Somes
HEDIN LLP
1100 15TH Street NW, Suite 04-108
Washington, D.C. 20005
tsomes@hedinllp.com

Elliot O. Jackson
HEDIN LLP
1395 Brickell Ave. Suite 610
Miami, FL 33131-3302
ejackson@hedinllp.com

***Counsel for Plaintiff and the Putative Class***

/s/      *Jennifer W. Torrez*

Jennifer Torrez (*pro hac vice*)

*Counsel for Defendant Pig Newton, Inc.*

#35462390v1